## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 20-21549-Civ-WILLIAMS/TORRES

GEICO GENERAL INSURANCE COMPANY,

     Plaintiff,

v.

EILEEN GONALEZ *et al.*,

     Defendants.

_____/

## REPORT AND RECOMMENDATION
## ON PENDING MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on Eileen Gonzalez's, Frank Bennar's, and Zabryna Acuna's ("Minor Acuna") (collectively, "Defendants") and Geico Insurance General Insurance Company's ("Geico") motions for summary judgment. [D.E. 52-53]. Each party timely filed their respective responses [D.E. 60-61] and replies [D.E. 66-67]. Therefore, the motions are now ripe for disposition. After careful consideration of the motions, responses, replies, relevant authorities, and for the reasons discussed below, Geico's motion for summary judgment should be **GRANTED** in all respects and Defendants' motion for summary judgment should be **DENIED**.[1]

---

[1]    On March 18, 2021, the Court referred the parties' motions for summary judgment to the undersigned Magistrate Judge for disposition. [D.E. 65].

1

## I. BACKGROUND

Given the quality of drivers in Miami-Dade County, and our exceedingly high insurance rates that lead the nation, it would come as a surprise to some that use of golf carts on our roadways is becoming more common. This trend seems unwise, to put it mildly, because bad things happen when a golf cart meets a two-ton vehicle. And when bad things happen, litigation ensues. Take this case.

On March 30, 2016, Geico issued a Florida Family Automobile Insurance Policy to Monika Caridad Acuna ("Mrs. Acuna") and Jesse Acuna ("Mr. Acuna") (collectively, the "Acunas"). The policy included bodily injury limits of $10,000 for each person and $20,000 for each occurrence. Afterwards, Minor Acuna drove a 1987 golf cart with four passengers that collided with a 2008 Dodge Caliber on July 4, 2016 in Miami-Dade County. The accident resulted in significant injuries to the passengers in the golf cart, including Devin Bennar and his siblings. Those passengers then sued Minor Acuna in Florida state court for their injuries, hospitalization expenses, disfigurement, and mental anguish. Geico provided a defense to Minor Acuna pursuant to a reservation of rights clause included in the automobile insurance policy, but the plaintiffs prevailed and the state court entered a final judgment in excess of the policy limits.

Following entry of the state court judgment, Geico filed this declaratory action on April 11, 2020 to determine the rights and obligations of the parties under the insurance policy. [D.E. 1]. Geico took the position that coverage does not exist for the motor vehicle accident and that the company had no obligation to defend or

indemnify.   Defendants filed an answer on June 1, 2020 with allegations that Geico breached the insurance contract "[b]y refusing to settle the Bennars claim against Ms. Acuna and by further refusing to indemnify her against the Final Judgment." [D.E. 16 at 8].   The parties have now filed a motion for summary judgment, and with the benefit of a response and reply, the motions are now ripe for disposition.

## II. APPLICABLE PRINCIPLES AND LAW

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).   On summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.   *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 597 (1986) (quoting another source).

In opposing a motion for summary judgment, the nonmoving party may not rely solely on the pleadings, but must show by affidavits, depositions, answers to interrogatories, and admissions that specific facts exist demonstrating a genuine issue for trial.   *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317,

3

323ʙ24 (1986).   The existence of a mere "scintilla" of evidence in support of the nonmovant's position is insufficient; there must be evidence on which the jury could reasonably find for the nonmovant.   *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).   A court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, or upon which the non-movant relies, are implausible.   *See Mize v. Jefferson City Bd. Of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996) (citing *Matsushita*, 475 U.S. at 592-94).

At the summary judgment stage, the Court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.   In making this determination, the Court must decide which issues are material.   A material fact is one that might affect the outcome of the case.   *See id.* at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.   Factual disputes that are irrelevant or unnecessary will not be counted.").   "Summary judgment will not lie if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   *Id.*

### III. ANALYSIS

#### A.   *General Principles of Insurance Contracts*

"Under Florida law, an insurance policy is treated like a contract, and therefore ordinary contract principles govern the interpretation and construction of such a policy." *Pac. Emp'rs Ins. Co. v. Wausau Bus. Ins. Co.*, 2007 WL 2900452, at *4

(M.D. Fla. Oct. 2, 2007) (citing *Graber v. Clarendon Nat'l Ins. Co.*, 819 So. 2d 840, 842 (Fla. 4th DCA 2002)).   The interpretation of an insurance contract – including the question of whether an insurance provision is ambiguous – is a question of law to be determined by the court.   *See id.*; *Travelers Indem. Co. of Illinois v. Hutson*, 847 So. 2d 1113 (Fla. 1st DCA 2003) (stating that whether an ambiguity exists in a contract is a matter of law); see also *James River Ins. Co. v. Ground Down Eng'g, Inc.,* 540 F.3d 1270, 1274 (11th Cir. 2008).

In addition, "[u]nder Florida law, insurance contracts are construed according to their plain meaning." *Garcia v. Fed. Ins. Co.*, 473 F.3d 1131, 1135 (11th Cir. 2006) (quoting *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005)).   The "terms of an insurance policy should be taken and understood in their ordinary sense and the policy should receive a reasonable, practical and sensible interpretation consistent with the intent of the parties-not a strained, forced or unrealistic construction." *Siegle v. Progressive Consumers Ins. Co.*, 819 So. 2d 732, 736 (Fla. 2002) (quoting *Gen. Accident Fire & Life Assurance Corp. v. Liberty Mut. Ins. Co.*, 260 So. 2d 249 (Fla. 4th DCA 1972)); *see also Gilmore v. St. Paul Fire & Marine Ins.*, 708 So. 2d 679, 680 (Fla. 1st DCA 1998) ("The language of a policy should be read in common with other policy provisions to accomplish the intent of the parties."); *see also James River,* 540 F.3d at 1274 ("In interpreting insurance contracts, 'the language of the policy is the most important factor' [which] are construed according to their plain meaning.") (quoting in part *Taurus,* 913 So. 2d at 532).

5

However, if there is more than one reasonable interpretation of an insurance policy, an ambiguity exists and it "should be construed against the insurer." *Pac. Emp'rs Ins.*, 2007 WL 2900452, at *4 (citing *Purrelli v. State Farm Fire & Cas. Co.,* 698 So. 2d 618, 620 (Fla. 2d DCA 1997)).   Where an interpretation "involve[s] exclusions to insurance contracts, the rule is even clearer in favor of strict construction against the insurer: exclusionary provisions which are ambiguous or otherwise susceptible to more than one meaning must be construed in favor of the insured." *Sphinx Int'l, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,* 412 F.3d 1224, 1228 (11th Cir. 2005) (quoting *State Farm Mut. Auto. Ins. Co. v. Pridgen,* 498 So. 2d 1245, 1248 (Fla. 1986)).   An insurance policy must, of course, be ambiguous before it is subject to these rules.   *See Taurus Holdings, Inc.*, 913 So. 2d at 532 ("Although ambiguous provisions are construed in favor of coverage, to allow for such a construction the provision must actually be ambiguous.").   An ambiguous policy must, for example, have a genuine inconsistency, uncertainty, or ambiguity in meaning after the court has applied the ordinary rules of construction.   *See Deni Assocs. of Florida, Inc. v. State Farm Fire & Cas. Ins. Co.,* 711 So. 2d 1135 (Fla. 1998). "Just because an operative term is not defined, it does not necessarily mean that the term is ambiguous."   *Amerisure Mut. Ins. Co. v. Am. Cutting & Drilling Co.*, 2009 WL 700246, at *4 (S.D. Fla. Mar. 17, 2009) (citing *Swire Pac. Holdings, Inc. v. Zurich Ins. Co.,* 845 So. 2d 161, 166 (Fla. 2003)).

On the other hand, "if a policy provision is clear and unambiguous, it should be enforced according to its terms whether it is a basic policy provision or an

exclusionary provision." *Hagen v. Aetna Cas. & Sur. Co.,* 675 So. 2d 963, 965 (Fla. 5th DCA 1996).  Ultimately "in the absence of some ambiguity, the intent of the parties to a written contract must be ascertained from the words used in the contract, without resort to extrinsic evidence." *Fireman's Fund Ins. Co. v. Tropical Shipping & Const. Co.*, 254 F.3d 987, 1003 (11th Cir. 2001) (quoting *Lee v. Montgomery*, 624 So. 2d 850, 851 (Fla. 1st DCA 1993)); *see also Southern-Owners Ins. Co. v. Easdon Rhodes & Assocs. LLC,* 872 F.3d 1161, 1170 (11th Cir. 2017) ("Florida law is clear that ambiguity does not result simply because complex analysis is required to discern the plain meaning of a provision of an insurance contract. . . . Indeed, Florida courts have repeatedly cautioned that it is improper to 'rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties' while seeking to identify ambiguity not actually present in the insurance policy.") (affirming summary judgment enforcing exclusion clause in unambiguous policy).

### B.    *The Duty to Defend*

Under Florida law, an insurer's duty to defend is triggered if the allegations of a complaint brought against the insured fall within the scope of the insurer's duty.  *See Higgins v. State Farm Fire & Cas. Co.,* 894 So. 2d 5, 9–10 (Fla. 2004) (citations omitted).   A court looks no further than to the terms of the insurance policy and the allegations of the underlying complaint brought against the insured to determine if the duty to defend is triggered.  *See id.*  "If the complaint alleges facts partially within and partially outside the scope of coverage, the insurer is obligated to defend the entire suit."  *MJCM, Inc. v. Hartford Cas. Ins. Co.,* 2010

7

WL 1949585, at *4 (M.D. Fla. May 14, 2010) (citing *Battisti v. Continental Cas. Co.,* 406 F.2d 1318, 1321 (5th Cir. 1969)); *see also Grissom v. Commercial Union Ins. Co.,* 610 So. 2d 1299, 1307 (Fla. 1st DCA 1992) ("All doubts as to whether a duty to defend exists in a particular case must be resolved against the insurer and in favor of the insured.  So long as the complaint alleges facts that create potential coverage under the policy, the insurer must defend the suit.").  To put it simply, the duty to defend "depends solely on the allegations in the complaint filed against the insured." *Trizec Properties, Inc. v. Biltmore Const. Co.,* 767 F.2d 810, 811 (11th Cir. 1985) (citing *Tropical Park, Inc. v. United States Fidelity and Guaranty Co.,* 357 So. 2d 253, 256 (Fla. 3d DCA 1978); *Coblentz v. American Surety Co.,* 416 F.2d 1059, 1062 (5th Cir. 1969)).

As with any other insurance policy, "[d]oubts as to whether a duty to defend exists are resolved in favor of the insured, and exclusionary clauses in insurance contracts are to be construed liberally in favor of the insured." *Id.* at *5 (citing *Trizec Properties, Inc.*, 767 F.2d at 812).  This means "an insurer must defend a lawsuit against its insured if the underlying complaint, when fairly read, alleges facts which create potential coverage under [the] policy." *McCreary v. Fla. Res. Prop. & Cas. Joint Underwriting Ass'n,* 758 So. 2d 692, 695 (Fla. 4th DCA 1999) (citing *Fun Spree Vacations, Inc. v. Orion Ins. Co.,* 659 So. 2d 419, 421 (Fla. 3d DCA 1995)); *see also Essex Ins. Co. v. Big Top of Tampa, Inc.,* 53 So. 3d 1220, 1223 (Fla. 2d DCA 2011) ("A liability insurer has no duty to defend a suit where the complaint on its face alleges facts which fail to bring the case within the coverage of

8

the policy." (citing *Auto–Owners Ins. Co. v. Marvin Dev. Corp.,* 805 So. 2d 888, 891 (Fla. 2d DCA 2001)).   However, "[w]here the complaint's allegations show either that a policy exclusion applies or that no coverage exists, no duty to defend arises." *Kenneth Cole Prods., Inc. v. Mid-Continent Cas. Co.*, 763 F. Supp. 2d 1331, 1334 (S.D. Fla. 2010) (citing *Federal Ins. v. Applestein,* 377 So. 2d 229, 232 (Fla. 3d DCA 1979)).

### C.     *The Duty to Indemnify*

"An insurer's duty to indemnify is narrower than its duty to defend and must be determined by analyzing the policy coverages in light of the actual facts in the underlying case." *Sinni v. Scottsdale Insurance Co.*, 676 F. Supp. 2d 1319, 1323 (M.D. Fla. 2010) (citing *State Farm Fire & Cas. Co. v. CTC Dev. Corp.*, 720 So. 2d 1072, 1077 n.3 (Fla. 1998); *Hagen v. Aetna Cas. & Sur. Co.*, 675 So. 2d 963, 965 (Fla. 5th DCA 1996)).   That is, in contrast to the duty to defend, the duty to indemnify is dependent upon the entry of a final judgment, a settlement, or a final resolution of the underlying claims by some other means.   *See Northland Cas. Co. v. HBE Corp.*, 160 F. Supp. 2d 1348, 1360 (M.D. Fla. 2001) (citing *Travelers Ins. Co. v. Waltham Indus. Lab. Corp.*, 883 F.2d 1092, 1099 (1st Cir. 1989); *Beaudette, Inc. v. Sentry Ins.*, 94 F. Supp. 2d 77, 100 (D. Mass. 1999)).

Unless the insured can demonstrate that it suffered a covered loss under the policy, the insurer has no duty to indemnify.   *See Northland Cas. Co.*, 160 F. Supp. 2d at 1360 (citing *Matter of Celotex Corp.*, 152 B.R. 661, 666 (Bankr. M.D. Fla. 1993)). "[W]hereas the duty to defend is measured by the allegations of the underlying complaint, the duty to indemnify is measured by the facts as they unfold at trial or

are inherent in the settlement agreement." *Northland Cas. Co.*, 160 F. Supp. 2d at 1360 (citation and quotation marks omitted).   An insurer's duty to indemnify is therefore dependent on the outcome of a case, meaning any declaration as to the duty to indemnify is premature unless there has been a final resolution of the underlying claim.   "The only exception to this general rule is if the court can determine that the allegations in the complaint could under no circumstances lead to a result which would trigger the duty to indemnify." *Northland Cas. Co.*, 160 F. Supp. 2d at 1360 (citing *Sphere Drake, P.L.C. v. 101 Variety, Inc.*, 35 F. Supp. 2d 421, 430-31 (E.D. Pa. 1999)).   "In such a situation, the court could adequately assess the duty to indemnify prior to a conclusion on the merits of the underlying litigation." *Id*.

Given that the duty to defend is broader than the duty to indemnify, *Tropical Park, Inc.*, 357 So. 2d at 256, an insurer has no duty to indemnify if there is no duty to defend. *See Clarendon Nat'l Ins. Co. v. Vickers*, 2006 WL 8434796, at *3 (S.D. Fla. May 25, 2006) (collecting cases).   Stated differently, "'a court's determination that the insurer has no duty to defend *requires* a finding that there is no duty to indemnify.'" *Mt. Hawley Ins. Co. v. Miami River Pt. Terminal, LLC*, 228 F. Supp. 3d 1313, 1326 (S.D. Fla. 2017) (emphasis in original) (quoting *Trailer Bridge, Inc. v. Ill. Nat'l Ins. Co.*, 657 F.3d 1135, 1146 (11th Cir. 2011)).   With these principles in mind, we turn to the merits.

### D.   _Geico's Motion for Summary Judgment_

Geico seeks summary judgment because the golf cart that Minor Acuna operated fails to meet the policy definition for a "private passenger auto."   Geico also says that summary judgment should be granted on Defendants' counterclaim for breach of contract because it is unclear what breach ever took place if the company properly denied coverage for a golf cart.   If this holds, Geico reasons that it could not have committed a breach of contract and there was no duty to defend or indemnify for a lack of insurance coverage.   That leads Geico to conclude that its motion for summary judgment should be granted in all respects.

Defendants oppose the relief requested because, in their view, the golf cart that Minor Acuna operated on July 4, 2016 qualifies as an "auto" under the insurance policy.   Defendants claim that Florida law holds insurers responsible for drafting policy language and that, if Geico wanted to exclude golf carts, it could have done so. Defendants also accuse Geico of imposing requirements that are outside the scope of the policy agreement, rendering Geico's motion for summary judgment both legally and factually incorrect.   Because golf carts are a common and foreseeable risk in Florida and fall within the definition of "auto," Defendants say that coverage exists for the golf cart and that the Court should grant their motion for summary judgment. We consider each argument in turn.

### 1.   _Whether the Golf Cart Qualifies as a Private Passenger Auto_

The first question is whether the golf cart that Minor Acuna operated on July 4, 2016 qualifies as a "private passenger auto" under Section I of the policy.   The

11

policy provides liability coverage for bodily injury, and damage or destruction to an

(1) owned or (2) non-owned automobile:

> Under Section I, we will pay damages which an insured becomes legally
> obligated to pay because of:
> 1. Bodily injury, sustained by a person, and
> 2. Damage to or destruction of property, arising out of the ownership,
>    maintenance or use of the owned auto or a non-owned auto.

[D.E. 50 at 9-10].   The policy then adds a specific definition on what qualifies as an

"owned" and a "non-owned" auto:

> Non-owned auto means a private passenger, farm or utility auto or
> trailer not owned by, furnished or available for regular use of either you
> or your relative, other than a temporary substitute auto.   An auto
> rented or leased for more than 30 days will be considered as furnished
> or available for regular use.
>
> Owned auto means:
>
> (a) A vehicle described in this policy for which a premium charge is
>     shown for these coverages;
> (b) A trailer owned by you;
> (c) A private passenger, farm or utility auto, ownership of which you
>     acquire during the policy period or for which you enter into a lease
>     during the policy period for a term of six months or more, if
>      i. It replaces an owned auto as defined in (a) above; or
>      ii. We insure all private passenger, farm or utility autos owned
>       by you on the date of the acquisition, and you ask us to add it
>       to the policy no more than 30 days later;
> (d) A temporary substitute auto.

[D.E. 50-1 at 9, ¶¶ 5-6].

The parties agree that the golf cart does not fit within the definition of an

"owned auto" because (1) the golf cart is not listed anywhere in the policy, (2)

discovery has revealed that a separate individual owns the vehicle, and (3) the

Acunas did not otherwise purchase or lease the vehicle during the policy period.

However, where the parties disagree is whether the golf cart qualifies as a "non-owned auto" and more specifically a "private passenger auto."   To answer that question, it requires a close look at the definitions underpinning the meaning of a "non-owned auto," including the terms "private passenger auto," "trailer," "farm auto," and "utility auto" – all of which the policy defines separately:

> Farm auto means a truck type vehicle with a gross vehicle weight of 15,000 pounds or less, not used for commercial purposes other than farming.
> . . .
> Private passenger auto means a four-wheeled private passenger, station wagon or jeep-type auto, including a farm or utility auto as defined.
> . . .
> Trailer means a vehicle designed to be towed by a private passenger auto.   If the vehicle is being used for business or commercial purposes, it is a trailer only while used with a private passenger, farm or utility auto. Trailer also means a farm wagon or farm implement used with a farm auto.
> . . .
> Utility Auto means a vehicle, other than a farm auto, with gross vehicle weight of 15,000 pounds or less of the pick-up body, van or panel truck type not used for commercial purposes.

*Id*. at ¶¶ 3, 7, 10, 11.

Geico says that the focus here should be on whether the golf cart qualifies as a "private passenger auto" because none of the other definitions under "non-owned" auto apply.   Geico claims, for example, that the golf cart is not a "farm auto" because it cannot be used for farming purposes and that the "trailer" definition is inapplicable since a golf cart lacks a design to be towed.   Geico also posits that a golf cart cannot be a "utility auto" because it lacks a "pick-up body, van or panel truck type" design. *Id*. at ¶ 10.   So, given that three out of the four definitions are inapplicable, Geico

13

has narrowed down the analysis to whether the golf cart qualifies as a "private passenger auto."

Starting with that presumption, Geico argues that the golf cart fails to qualify as a "private passenger auto" because the ordinary meaning of these terms points to a vehicle that must be safe or legal to drive on a public road or highway. Geico suggests that this definition is consistent with how Florida courts have construed these terms throughout other insurance policies and that, since a golf cart cannot legally transport passengers on public roads, it fails to qualify as a "private passenger auto." If the Court finds otherwise, Geico suggests that it would not only contravene the intent of the parties, but that it would also lead to an absurd and overly broad interpretation of an unambiguous set of terms.

As support, Geico relies primarily on the Second District's opinion in *Martin v. Nationwide Mut. Fire Ins. Co.,* 235 So. 2d 14, 16 (Fla. 2d DCA 1970)[2], where an insured had an automobile insurance policy that provided coverage for "owned

---

[2]   The policy in *Martin* defined "private passenger automobile," "farm automobile," and "utility automobile," as follows:

> [P]rivate passenger automobile' means a four wheel private passenger station wagon or jeep type automobile; farm automobile means an automobile of a truck type with a load capacity of fifteen hundred pounds or less not used for business or commercial purposes other than farming; utility automobile' means an automobile, other than a farm automobile, with a load capacity of fifteen hundred pounds or less of the pick-up body, sedan delivery or panel truck type not used for business or commercial purposes.

*Id*. at 15 (quotation marks omitted).

14

automobiles," defined, in part, as a private passenger, farm or utility automobile. *Id*. at 15.   The question there was whether insurance coverage applied to the loss of a jeep and fit the definition of an automobile.   The trial court, sitting without a jury, determined that the jeep – while not suitable for driving on a public road – constituted an automobile within the meaning of the policy.

However, the Second District reversed that finding because, when looking to the definitions provided under the policy, the agreement contemplated a vehicle that could only be driven legally and safely on public highways:

> Reading the definitions of 'private passenger automobile,' 'farm automobile,' and 'utility automobile' reveals an element, albeit implicit, common to each.   A station wagon, a jeep, and trucks of the pick-up, panel and farm type, have as an inherent design characteristic the capacity to be driven legally and safely on public highways.   The facts herein reveal that this was lacking in appellant's 'jeep.'   Unlike the situation where an automobile is rebuilt, or undergoes major repairs or is inoperable because of the temporary absence of an essential component, here the 'jeep' was, to use the vernacular, virtually built from scratch.   What appellant evidently had in mind was the construction of a vehicle that would be of some use on a farm, or simply of enjoyment to drive in a pasture.   Appellant did not design the vehicle to be driven on public roads, and the record demonstrates that it was not driven on the road.   These facts clearly give rise to the conclusion that appellant's formerly owned 'jeep' was not an 'automobile' within the meaning of the express terms of the contract.

*Id*. at 16.   Thus, the appellate court concluded in *Martin* that the jeep "was neither designed nor intended to be used on public highways," and that it was "highly unlikely that an average, prudent person could be expected to purchase automobile liability insurance for such a vehicle in these circumstances[.]"   *Id*. at 17.

Geico says that that this holding is consistent with cases in other jurisdictions – including Maryland, Michigan, and Rhode Island – because regardless of what state an insurance policy falls under, a private passenger automobile requires a vehicle to have the characteristics of being driven legally and safely on public highways.  *See, e.g.*, *Fergison v. Stonebridge Life Ins. Co.*, 2007 WL 286793, at *1 (Mich. Ct. App. Feb. 1, 2007) (affirming summary judgment in favor of the insurer on the grounds that a golf cart was not a "private passenger automobile" nor a "land motor vehicle" and stating, "we must admit that it is difficult to imagine one might logically intend to include such a vehicle in the definition of 'private passenger automobile,' lacking as it does any sort of cabin structure.  Absent doors, sides, a roof, or any discernable safety features, we must also admit that it seems unlikely that such vehicles are meant for use on roadways more populated by cars and trucks."); *Progressive Cas. Ins. Co. v. Dunn*, 106 Md. App. 520, 529 (1995) (finding that a golf cart did not constitute an "automobile" for the purposes of liability automobile insurance because a golf cart lacks "the common safety and operational features conducive to, or required for, travel on the public roads" and is "designed to be an off-road vehicle, principally to transport golfers around the terrain of golf courses."); *Jennings v. Midville Golf Club, Inc.*, 636 A.2d 707, 708 (R.I. 1994) (interpreting an insurance policy with no definition of the term "auto" but finding that "[w]e do not think that the plain, ordinary, and usual meaning of auto includes four-wheeled, motorized golf carts.").

16

Geico also claims that these cases are consistent with the evidence in the record because several deponents have reached the same conclusion.   Geico relies, for example, on the deposition testimony of its corporative representative because he clarified that a golf cart does not qualify as an automobile suitable for a highway:

> Q: And in this case, GEICO has taken the position that the golf cart does not qualify as a non-owned auto, correct?
> A: Correct. . . It's not an owned auto.   The use of the word "automobile."
> A golf cart is not an automobile.   It's not designed for use on a highway.
> It's not designed for use on roads.   It's simply not an automobile, so it can't be a non-owned auto.

[D.E. 50-17 at 14:8-20].

> Q: Mr. Jones, can a golf cart safely transport passengers on a road or highway if it does not have seatbelts?
> MS. MEILER: Object to form.
> THE WITNESS: I would say, no, sir.
> BY MR. WELDY:
> Q: Can a golf cart safely transport passengers on a road or highway consistent with the regulations, the state highway regulation in Florida, if it does not have turn signals?
> MS. MEILER: Object to form.
> THE WITNESS: No, sir.
> BY MR. WELDY:
> Q: Can a golf cart safely transport passengers on a road or highway consistent with Florida highway regulations if it does not have a windshield?
> MS. MEILER: Object to form.
> THE WITNESS: No, sir.

*Id*. at 75:5-22.

Geico contends that the testimony of all other deponents is the same and that there is no evidence to find that an "private passenger auto" is anything other than a vehicle that has the "capacity to be driven legally and safely on public highways." *Martin*, 235 So. 2d at 16.   So, given that Florida makes it unlawful to operate a golf

17

cart on public roads or streets unless they meet specific exceptions, Geico concludes that there is no coverage for the underlying accident.  *See* Fla. Stat. 316.212 ("The operation of a golf cart upon the public roads or streets of this state is prohibited except as provided herein"); *Herring v. Horace Mann Ins. Co.*, 795 So. 2d 209, 211 (Fla. 4th DCA 2001) ("We note that golf carts, as such, are not generally designed for use on public roads, and their use on public roads in Florida is prohibited except under conditions specified by statute.  A golf cart, patently, is designed for operation at low speed on a golf course or for similar sporting or recreational purposes, or for transportation on private property.") (internal citation omitted).

Defendants challenge Geico's argument as unpersuasive because it relies on inapposite cases and decisions from other jurisdictions that apply different rules of contract interpretation.  Defendants say that the answer to the question presented is simple if the Court looks to the meaning of "private passenger auto" because the policy defines these terms as "a four-wheel private passenger, station wagon or jeep-type auto, including a farm or utility auto."  [D.E. 50-1 at 9, ¶ 5].  Defendants reason that all other requirements – except for the question of whether the golf cart qualifies as an "auto" – have been satisfied because Geico's corporate representative conceded that (1) a private individual owned the golf cart, (2) that the golf cart has four wheels, and (3) that manufacturers designed the golf cart to transport passengers:

> Q. We agree that it's private, right?
> A. Somebody owns it privately, yes, ma'am.
> Q. And we can agree that it's [a] passenger?

A. They can carry passengers, yes, ma'am.
Q. So, the question is whether it's an auto, right?
A. That's correct.
Q. And that's the only dispute that you and I have about whether this golf cart falls within the definition of private passenger auto, correct?
A. Correct.

[D.E. 50-17 at 19:16-20:1].   Thus, Defendants reason that the only question left is whether the golf cart qualifies as an "auto."

Defendants then say that the way to answer that question is to look to Florida cases where the term "auto" is undefined in an insurance policy.   Defendants rely primarily on the Fourth District's decision in *Fireman's Fund Ins. Cos. v. Pearl*, 540 So. 2d 883 (Fla. 4th DCA 1989), because there a plaintiff sued an insured on a liability claim arising out of the use of a rented golf cart.   And the automobile policy in that case covered the insured for the use of "any auto or trailer" and for any "auto" accident.

Defendants claim that the insurer tried to avoid coverage for the vehicle with the same argument that Geico presents here – that a golf cart does not constitute an "auto" because it "is not ordinarily thought of as an automobile."   *Id*. at 884. However, the trial court rejected that argument and the Fourth District affirmed because, when looking at the use of the undefined "auto" term and the exclusionary language of the policy, it created an ambiguity that had to be construed in favor of the insurer.   *See id*. at 884 ("[T]aking the liability section of the policy as a whole, we conclude that the trial court did not err in recognizing that the use of the undefined term 'auto,' coupled with the language in the exclusionary clause, created an

19

ambiguity, and in construing the intent of the parties against the insurer.") (citation omitted); *see also Herring*, 795 So. 2d at 212 ("Because the policy language creates an ambiguity as to whether there is coverage for a golf cart when it is not being used for golfing, we must construe the policy in favor of the insured.") (citing *Union Am. Ins. Co. v. Maynard,* 752 So. 2d 1266, 1268 (Fla. 4th DCA 2000)).   Hence, Defendants ask that the Court reach the same result here because Geico failed to include a definition for "auto" in the insurance policy.

Defendants also cast doubt on the relevance of the Second District's decision in *Martin* because that case is almost 20 years older than *Pearl* and fails to address the question of whether a golf cart is covered under an insurance policy when the term "auto" is undefined.   Defendants also say that the vehicle in *Martin* was a "jeep" that was "virtually built from scratch," "inoperable," and transported to the purchaser for the purpose of herding cattle on farmland.   And given that the question in *Martin* was different than one presented to the extent it considered whether an automobile was required to be listed under an insurance policy to trigger automatic coverage, Defendants reason that *Martin* is limited to a unique set of facts.

Defendants' second argument is that the term "auto" is ambiguous under the policy and that Geico's cases fail to show otherwise.   Specifically, Defendants highlight that every Florida case requiring a golf cart to be used for travel on public roads included an express requirement in those underlying policies.   *See State Farm Mut. Auto. Ins. Co. v. Baldassini*, 909 F. Supp. 2d 1363 (S.D. Fla. 2012) (stating that the definition of a car was a "land motor vehicle with four or more wheels which is

20

designed for use mainly on public roads"); *Bailey v. Netherlands Ins. Co.,* 615 F. Supp. 2d 1332 (M.D. Fla. 2009) ("'Auto' means a land motor vehicle, 'trailer' or semitrailer designed for travel on public roads but does not include 'mobile equipment.'"); *Angelotta v. Security Nat'l Ins. Co.*, 117 So. 3d 1214 (Fla. 5th DCA 2013) (policy defining auto as "[a]ny self-propelled private passenger motor vehicle with not less than four wheel designed principally for use on paved public streets and highways").   And given that the policy here does not include an express requirement for a golf cart to be capable of operating on public roads, Defendants accuse Geico of reading into the policy a set of terms that do not otherwise exist.

Having summarized the parties' respective positions, the disagreement here turns largely on where to begin the analysis.   Geico starts with the definition of "private passenger auto" whereas Defendants look to the specific terms (i.e. "auto") within that definition.   The parties also disagree on which Florida appellate court case – *Martin* or *Pearl* – is the most relevant in determining whether the golf cart is excluded from coverage.   At first blush, a conflict seems to exist between the two decisions on how to interpret insurance contracts vis-a-vis golf carts.   But, as we explain below, the cases are noticeably different.

Defendants begin with the assertion that *Pearl* is most instructive because the issue there was whether an insured was covered under an insurance policy for the operation of a rented golf cart.   Yet, other than the similarity of both cases involving a golf cart, the cases are distinguishable due to the differences in the policy language. The policy in *Pearl* included coverage for the use of "any auto or trailer" and for any

"auto" accident.   The insurer failed to define any of these terms and that is why the Fourth District looked at other relevant cases, including a Florida Supreme Court decision, to determine if a golf cart should be considered an automobile.   The Fourth District ultimately affirmed the lower court's decision in finding an ambiguity because, without any definition in the policy, coverage had to be construed against the insurer.

That is noticeably different than the facts here because Geico's policy includes specific definitions for "non-owned auto" and its relevant subparts.   Defendants complain, however, that the definitions are still ambiguous because – despite the policy defining "non-owned auto," "private passenger auto", "farm auto," and "trailer" – Geico failed to define "auto."   That argument is unpersuasive, in large part, because "auto" is never referred to as a singular term for coverage to exist.   Instead, "auto" is connected to other terms and, when those terms are linked, the policy provides a concrete definition.

*Pearl* is also materially different because liability coverage here does not exist for "any auto" in "any auto accident."   Rather, coverage exists for the use of a "non-owned auto" with one of those terms including a "private passenger auto" defined as a "four-wheel private passenger, station wagon or jeep- type auto, including a farm or utility auto[.]"   [DE 50-1 at 9, ¶ 7].   Therefore, *Pearl* has much less relevance than what Defendants suggest because (1) that case examined a policy that was entirely different, (2) the policy relied exclusively on the meaning of "auto"

in its singular capacity, and (3) the policy failed to include any definitions or context as to the definition of that term.

There are similar failings with Defendants' reliance on the Eleventh Circuit's decision in *Baldassini*.   Defendants say that the "insurance policy in *Baldassini* provided coverage" for a golf cart and that, without similar language here, the definition of "auto" or "private passenger auto" cannot impose the same requirement. [D.E. 60 at 6].   Not so.

In *Baldassini*, a fifteen-year-old teenager drove a 2009 golf cart and crashed it into an individual.   The injured individual reached a settlement with the parents of the fifteen-year-old child and the parents assigned any claims that existed under the applicable insurance policy.   After that assignment, State Farm filed a declaratory action in federal court seeking a ruling that the golf cart was not a "car" under the insurance contract.   The district granted summary judgment for State Farm, finding that the contract was unambiguous and that no coverage existed.

On appeal, the Eleventh Circuit considered the question of whether the golf cart met the definition of a "car" under the policy as "a land motor vehicle with four or more wheels, which is designed for use mainly on public roads."   *Baldassini*, 545 F. App'x at 843.   The parties agreed that the golf cart constituted a "land motor vehicle with four or more wheels" so the analysis focused solely on whether the golf cart was designed for use on public roads.   *Id*.   Looking for help answering that question, the Eleventh Circuit examined Florida case law where the Court found that the meaning of the phrase "designed for use" is an object that "has been made for a particular

23

purpose so that it can be used for that purpose with reasonable efficiency and safety." *Id*. at 844 (citing *American Emp. Ins. Co. v. Yeomans,* 356 So. 2d 1281, 1285 (Fla. 2d DCA 1978) ("'[D]esigned for use with' seems to us to connote an object planned with a particular use in mind and so manufactured as to serve that use with reasonable efficiency and safety.")) (quotation marks omitted).

Taking that definition and applying the everyday meaning of the phrase "designed for use mainly on public roads," the Eleventh Circuit determined that coverage did *not* exist for the golf cart because it failed to meet that purpose. The Eleventh Circuit relied, in part, on the manual of the golf cart, where it explicitly stated that the vehicle was designed and manufactured for off-road use and did not conform to Federal Motor Vehicle Safety Standards. The court also noted that the manufacturer of the golf cart placed a sticker on the dashboard warning against driving the vehicle on highways and finding that the golf cart did not have a "number of safety features required by law for passenger cars driven on public roads[.]" *Id*. And neither the owners nor anyone else made any modifications to the golf cart to make it roadworthy. So, "even though the [golf cart] ha[d] some safety features, like brake lights, that would minimize some of the dangers of driving it on a highway, it [was] not, as the policy requires, 'designed for use mainly on public roads.'" *Id*. at 845.

Defendants interpret this case to mean that an express policy provision must be included in a contract for there to be a requirement that a golf cart designed for travel on public roads. But, there is no support for that assertion in *Baldassini*.

24

The difference between this case and *Baldassini* is that the latter included an explicit policy requirement for coverage to exist so long as a vehicle was designed for use on a public road.   And that is why the Eleventh Circuit examined whether the golf cart had to be designed for that purpose.   Defendants misread *Baldassini* to say that, if a policy does not include a requirement that a golf cart be designed for public roads, then no other policy can have the same effect without similar language.   However, without any Florida authority establishing that principle, Defendants are making unsupported inferences and attaching it to the holding of a case where it otherwise does not exist.   And just because the policy in *Baldassini* included an explicit requirement that a golf cart be designed for a public road does not mean that *all* other policies must include similar language to have the same effect.   This sort of reasoning is like a situation where one makes an observation and then applies it across-the-board with the rationale that, since it existed here, then it must be required elsewhere.   Yet, from a logical standpoint, the presence of something in one place does not necessarily make it required in another.

If there was any lingering doubt as to whether this argument had merit, *Martin* puts it to bed because the Second District found that a jeep had to be driven legally and safely on public highways even though the policy itself did not include that explicit requirement.   And *Martin* is also compelling because it shares the same policy definition for the terms "private passenger auto."   *Compare Martin*, 235 So. 2d at 15 ("'[P]rivate passenger automobile' means a four wheel private passenger station wagon or jeep type automobile") *with* [D.E. 50-1 at ¶ 7 ("Private passenger

auto means a four-wheel private passenger, station wagon or jeep-type auto, including a farm or utility auto as defined.")].   The same is true for the definitions of "farm automobile" and "utility automobile" because, other than small inconsequential differences, the definitions are practically the same.   *Compare Martin*, 235 So. 2d at 15 (""[U]tility automobile' means an automobile, other than a farm automobile, with a load capacity of fifteen hundred pounds or less of the pick-up body, sedan delivery or panel truck type not used for business or commercial purposes.") with [D.E. 50-1 at ¶ 11 ("Utility auto means a vehicle, other than a farm auto, with gross weight of 15,000 pounds or less of the pick-up body, van or panel truck type not used for commercial purposes.").   When examining these same definitions in *Martin*, the Second District concluded that all vehicles of this characteristic share an *implicit* requirement that they have the capacity to be driven legally and safely on public roads.   *See Martin*, 235 So. 2d at 16 ("Reading the definitions of 'private passenger automobile,' 'farm automobile,' and 'utility automobile' reveals an element, albeit implicit, common to each.   A station wagon, a jeep, and trucks of the pick-up, panel and farm type, have as an inherent design characteristic the capacity to be driven legally and safely on public highways.").   So, given that an implicit definition can be found to require a vehicle to be driven legally on public roads in Florida and *Martin* interpreted the same definitions that we have here, that casts substantial doubt that Plaintiff's interpretation of *Baldassini* is correct.

26

Defendants' rebuttal to *Martin* is that the case is older, the facts involved a jeep as opposed to a golf cart, and the question in that case was different than the one presented.   But, none of these arguments are convincing.   It is unclear, for instance, what relevance the age of *Martin* has on the analysis contained therein if the case remains good law and no court has otherwise overturned it.   As a federal court applying Florida law in diversity cases, we are bound by case precedent from the Florida Supreme Court.   Where we find none, we are "bound to adhere to decisions of the state's intermediate appellate courts absent some persuasive indication that the state's highest court would decide the issue otherwise."   *Provau v. State Farm Mut. Auto. Ins. Co.,* 772 F.2d 817, 820 (11th Cir. 1985) (quoted in *Winn-Dixie Stores, Inc. v. Dolgencorp, LLC,* 746 F.3d 1008, 1021 (11th Cir. 2014) (reversing judgment and remanding for new trial where trial court ignored intermediate appellate court in deeming restrictive covenant ambiguous)). Defendants have also not cited any Supreme Court decision that questions it or undermines *Martin's* analysis, nor do we find any persuasive basis to find that the Supreme Court would look at this issue differently.   So we are duty bound to apply *Martin* where it is relevant, as it is here despite its age or our disagreement with it. *See, e.g., Buckley Towers Condo., Inc. v. Katzman Garfinkel Rosenbaum, LLP,* 519 F. App'x 657, 659-61 (11th Cir. 2013) (reversing fee judgment that did not consider effect of 1964 intermediate court decision that had never been overruled and even though it was criticized as "outdated").

27

As to the criticism that the case is distinguishable, it is not clear to us why the presence of a jeep as opposed to a golf cart is anything other than a distinction without a material difference.   If anything, a far stronger case can be made that the "jeep" at issue in *Martin* was far more like an automobile than the golf cart here. Indeed, the only real difference is the application of the policy language to the facts. That is, rather than focusing on a golf cart, the Second District looked at a jeep and applied the same principles that are present here on whether the vehicle could be driven legally and safely on public highways.   And the appellate court determined that the jeep fell short of that requirement because the appellant constructed the vehicle to be used on a farm or in a pasture as opposed to a design for a use on public roads.   *See Martin*, 235 So. 2d at 16 ("What appellant evidently had in mind was the construction of a vehicle that would be of some use on a farm, or simply of enjoyment to drive in a pasture. Appellant did not design the vehicle to be driven on public roads, and the record demonstrates that it was not driven on the road.").   It is therefore unclear why the same analysis cannot and should not be undertaken here if the policy language is the same and the only difference is between a jeep and a golf cart.

Defendants also take issue with *Martin* because the case fails to consider a policy where the term "auto" is undefined.   But, Defendants are missing the forest for the trees because there is no need to clarify the meaning of "auto" when that term is subsumed in other definitions and given clarity.   The Second District called attention to this point in *Martin*, where the court stated that "'automobile' is not used

28

in the generic sense, as it is prefaced with the terms 'private passenger,' 'farm' and 'utility,' which in turn are further defined" in the policy language.   *Martin*, 235 So. 2d at 16.   That is why the Second District never found any of the terms in the policy to be vague or ambiguous or looked to cases interpreting the meaning of "automobile" because that was not the question presented.   *Id*.   ("[T]he cases construing 'automobile' to include vehicles as dissimilar as tractors and fork lifts are not applicable.   Proceeding from the standpoint that insurance contracts should receive a construction that it practical, reasonable and just, we turn to an examination of the *specific governing sections of the contract*.") (emphasis added, citations omitted).

The same reasoning applies here.   Defendants say that "auto" is undefined in the policy and that an ambiguity exists on whether a golf cart goes hand in hand with that term.   But, the only way that Defendants can arrive at that conclusion is by dividing the definition of "private passenger auto" into subparts when the entire definition should be considered as a whole.   In other words, Defendants look at the definition of "private passenger auto," reason that all the other terms are clear (i.e. station wagon, jeep, four-wheels) and then conclude that "auto" is the only term that needs clarification.   Defendants then focus on inapposite Florida cases that have defined "auto" when it appears by itself in an undefined policy agreement.

That strategy, while clever, is unpersuasive because otherwise it would allow any party to pick and choose specific terms under a definition and to create an ambiguity where none exists.   If an ambiguity existed each time an insurer failed to define every single term in a policy then, by that logic, an ambiguity would always

exist.   That is not, however, how Florida courts interpret insurance policies because an ambiguity only exists "if it is susceptible to two or more reasonable interpretations that can fairly be made." *Gas Kwick, Inc. v. United Pac. Ins. Co.*, 58 F.3d 1536, 1539 (11th Cir. 1995) (citing *Dahl-Eimers v. Mut. of Omaha Life Ins. Co.*, 986 F.2d 1379, 1381 (11th Cir. 1993)).   And that rule of construction only comes into play "when there is a genuine inconsistency or ambiguity in the policy[.]"   *Essex Ins. Co. v. Zota*, 607 F. Supp. 2d 1340, 1352–53 (S.D. Fla. 2009).

To be sure, "[w]hen a term in an insurance policy is undefined, it should be given its plain and ordinary meaning, and courts may look to legal and non-legal dictionary definitions to determine such a meaning." *Gov't Emps. Ins. Co. v. Macedo*, 228 So. 3d 1111, 1113 (Fla. 2017) (citing *Botee v. S. Fid. Ins. Co.*, 162 So. 3d 183, 186 (Fla. 5th DCA 2015)).   That means "[j]ust because an operative term is not defined, it does not necessarily mean that the term is ambiguous."   *Id.* (citing *Swire Pac. Holdings, Inc.*, 845 So. 2d at 166); *see also Miglino v. Universal Prop. & Cas. Ins. Co.*, 174 So. 3d 479, 481 (Fla. 4th DCA 2015) (examining Black's Law Dictionary definitions and noting that the "lack of a definition of a term in a policy does not render it ambiguous or in need of interpretation by the courts, but rather such 'terms must be given their every day meaning and should be read with regards to ordinary people's skill and experience.' 'Florida courts will often use legal and non-legal dictionaries to ascertain the plain meaning of words that appear in insurance policies.") (internal citations omitted).

These principles showcase the recurring flaw sprinkled throughout Defendants' briefs because – although they have a laser-like focus on "auto" being undefined – they never take the next step and explain why a singular word contained within several specific definitions renders everything ambiguous. Defendants are instead divining an ambiguity to marry it with Florida cases reaching different conclusions on the meaning of "auto" even though the policies in those cases are noticeably different. Defendants simply have no answer to *Martin*, where the Second District considered the same policy definitions to impose an implicit requirement that a vehicle be capable of being driven legally on public roads. Thus, the only conclusion to draw is that, for purposes of Section I, "private passenger auto," "farm auto," and "utility auto" require a vehicle to be driven legally and safely on public highways in Florida. *Id*.

## 2. *Whether Section 2 Renders the Policy Ambiguous*

Having failed to convince us that they should prevail in their Section I analysis, Defendants fall back on another theory focusing on Section II of the policy. Defendants contend that they still prevail because the policy remains ambiguous due to language found in Section II of the contract, where it defines "motor vehicle" as an item designed and required for use on public highways:

> Motor vehicle means any self-propelled vehicle of four or more wheels which is of a type both designed and required to be licensed for use on the highways of Florida and any trailer or semi-trailer designed for use with such vehicle.
> A motor vehicle does not include:
> (a) Any motor vehicle which is used in mass transit other than public school transportation and designed to transport more than five

> passengers exclusive of the operator of the motor vehicle and which
> is owned by a municipality, a transit authority, or a political
> subdivision of the state; or
>
> (b) A mobile home

[D.E. 1-1 at 13].   Defendants say that Geico omitted this restriction in Section I and

hence there is an open question as to whether coverage exists for the golf cart.

We have focused, to this point, only on Section I of the policy because that

includes the relevant provisions on bodily injury and property damage liability.

Section II, on the other hand, looks to personal injury protection ("PIP") benefits and

the payment of medical expenses:

> The above benefits [i.e. medical expenses, work loss, and death benefits,
> etc.] will be provided for injuries incurred as a result of bodily injury,
> caused by an accident arising out of the ownership, maintenance or use
> of a motor vehicle and sustained by:
>
> (1) You or any relative while occupying a motor vehicle or, while a
> pedestrian through being struck by a motor vehicle; or
>
> (2) Any other person while occupying the insured motor vehicle or,
> while a pedestrian through being struck by the insured motor
> vehicle.

[D.E. 1-1 at 14].

Defendants claim that we should consider the definition of "motor vehicle" in

Section II in connection with "auto" in Section I because Florida "courts should read

each policy as a whole, endeavoring to give every provision its full meaning and

operative effect." *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000)

(citing *Excelsior Ins. Co. v. Pomona Park Bar & Package Store,* 369 So. 2d 938, 941

(Fla. 1979) (noting that every provision in a contract should be given meaning and

effect and apparent inconsistencies reconciled if possible)); *see also Swire Pac.*

*Holdings, Inc.*, 845 So. 2d at 165 ("[W]hen analyzing an insurance contract, it is necessary to examine the contract in its context and as a whole, and to avoid simply concentrating on certain limited provisions to the exclusion of the totality of others.").

That argument is not entirely without merit because the policy's liability and PIP sections do use different terms to define the vehicles covered under their respective parts. The liability part uses, for instance, the terms "owned" and a "non-owned" auto – further defined into the subcategories of "private passenger auto", "farm auto," and "trailer" – whereas the PIP section uses the term "motor vehicle." But, while "courts will strive to interpret an insurance policy based on the definitions contained within," that rule does not apply "if the definition provided in one section of the policy is not applicable to the coverage at issue in another section[.]". *Grant v. State Farm Fire & Cas. Co.*, 638 So. 2d 936, 937 (Fla. 1994).[3]

That exception applies here because it is unclear why policy definitions in Section II have any relevance to Section I and, when these circumstances arise,

---

[3]      In *Grant*, the Florida Supreme Court affirmed the lower courts' decisions in finding an owner and operator of a motorcycle involved in an accident was not entitled to uninsured motorist coverage. *See id.* at 937–938. The issue was whether a motorcycle was a "motor vehicle" under the Uninsured Motor Vehicle section of the policy, which denied coverage for bodily injury to an insured while occupying a motor vehicle if it was not insured for this coverage under the policy. *See id.* at 937. The operator maintained that a motorcycle was not a motor vehicle because the No-Fault Coverage section of the policy defined a motor vehicle as "a vehicle with four or more wheels." *Id.* But, the Florida Supreme Court agreed with the insurer that, in the absence of a definition of motor vehicle in the Uninsured Motor Vehicle section of the policy, the statutory definition of motor vehicle found in Florida's Financial Responsibility Law – defining a motor vehicle as a "self-propelled vehicle which is designed and required to be license for use upon a highway" – supplied "the applicable definition." *Id.* at 937–938 (quoting Fla. Stat. § 324.021(1)).

"courts may be compelled to search elsewhere for a sensible and appropriate definition," including Florida statutes.   *Id*. (determining that definition used in one section of automobile policy "is not relevant to the exclusions discussion" in a different section of the policy, and therefore looking to Florida statutes for guidance in defining term).   That undercuts Defendants' argument in search of an ambiguity because – without any explanation as to why the definition of "motor vehicle" in Section II is relevant to the terms "non-owned" or "private passenger auto" in Section I – it is uncertain why one part of the policy should inform the other. That is especially true where we have different definitions in different sections covering different topics (i.e. coverage liability in Section I and medical payments in Section II).

However, even if we look past this shortfall and consider both sections of the policy, it is still unclear why an ambiguity exists when both "private passenger auto" in Section I and "motor vehicle" in Section II include the same requirement that golf carts be designed and licensed for use on Florida's public roads.   The only difference is that Section II includes this as an explicit requirement whereas Florida case law gives an implicit meaning to Section I.   So, even if we looked at both definitions as Defendants demand that we do, no ambiguity exists because both Sections I and II require a vehicle to be driven legally on public roads.   Defendants never tackled this issue in their briefs.   They only reasoned that the definitions were different and that Geico could have defined the policy with more specific meanings but failed to do so. Yet, that does not answer the question as to how an ambiguity exists if both sections

34

of the policy require a golf cart to be driven legally on Florida's public roads.   It shows, if anything, that the insurance policy is consistent.   This presumes, of course, that Section II is even relevant to begin with.   But even after making that assumption, we reach the same conclusion.

### 3. *Whether the Golf Cart Can be Driven Legally and Safely*

Based on our construction of the policy, the dispositive question is whether the golf cart was, prior to the accident, capable of being driven legally and safely on public roads.   Florida law provides, generally, that "[t]he operation of a golf cart upon the public roads or streets of this state is prohibited," unless it meets a specific exception enumerated under the statute.   Fla. Stat. § 316.212.

Defendants argue that the golf cart here meets the statute's exception because it possesses five essential characteristics: (1) efficient brakes, (2) a reliable steering apparatus, (3) safe tires, (4) a rearview mirror, and (5) red warning devices.   *See* Fla. Stat. § 316.212(6) ("A golf cart must be equipped with efficient brakes, reliable steering apparatus, safe tires, a rearview mirror, and red reflectorized warning devices in both the front and rear.").   Defendants say that three of these requirements are met given the undisputed evidence in the record (i.e. brakes, a steering apparatus, and tires) and that the only question remaining is whether the golf cart had rear-view mirrors and red warning devices.   [D.E. 60 at 8 ("[I]t is undisputed that the golf cart was equipped with brakes, a steering apparatus, and safe tires," but "[d]ue to the condition of the golf cart following the accident, it is unclear whether it had a rear view mirror or red reflectorized warning devices in

35

both the front and rear.")].   Although that question cannot be answered with the evidence presented thus far, Defendants conclude that that there is still enough evidence for Geico's motion to be denied because the golf cart had the *capacity* to operate on a public road.

The problem with Defendants' argument is that, while it meets three out of the five requirements for the golf cart to operate on a public road, it *concedes* that there is insufficient evidence to show that the vehicle could be driven legally under Florida law.   *See* Fla. Stat. § 316.212.   That is a fatal concession because, without any other evidence showing that the golf cart meets the final two requirements to be driven legally on public roads, there is no issue of fact as to whether coverage exists.   In other words, Defendants have undermined their argument because they have admitted that the golf cart here fails to meet an exception under Florida law and then referenced the underlying record to support Geico's position:

> Q. Do you know if this golf cart had red reflectorized warning devices?
> A. Based on the notes I saw and the pictures I saw, I don't know, ma'am.

[D.E. 50-17 at 53:4-7 (deposition of Scott Allen Jones)].

> Q. Were you able to determine whether the golf cart had rear turn signals?
> A. It did not appear so, and that was, if I'm not mistaken, from the detective.

[D.E. 50-18 at 98:18-21 (deposition of Sheri Delaney)]; *see also* [D.E. 59-2 (stating on a claim note that the "photo from the impound show headlights, turn signals, appears to be a gauges [sic] on the dash . . .gas pedal and brake. . . .[N]o mirror seen, but there is frame d[amage] from tipping so unk[nown] if any mirrors broke off").

Thus, without any other evidence to show that the golf cart meets all parts of the exception that allows it to be driven legally on public roads, the only conclusion to reach is that coverage does not exist and that Geico lacked a duty to defend or indemnify in the underlying state court action.

In a last-ditch but meager effort, Defendants say that so long as the golf cart had the "inherent capacity" to operate on a public road, that should be enough to find coverage.   [D.E. 66 at 4].   This is unpersuasive because capacity by itself is not the same as whether a vehicle can be driven legally and Defendants fail to rely on any cases in support of that comparison.   Defendants insist, however, that the Court should look solely to the language of the insurance policy because motor vehicle statutes and other doctrines are inapplicable when determining coverage.   The support for that assertion is somewhat unclear because, although Defendants reference the Second District's decision in *American States Ins. Co. v. Baroletti*, 566 So. 2d 314, 315 (Fla. 2d DCA 1990), they fail to explain how that case is relevant. Indeed, Defendants failed to pinpoint the relevant portion of that opinion. Defendants simply referenced an appellate court case, made a broad generalization about how questions of coverage are resolved solely by reference to a policy agreement, and concluded without any analysis that relying on the dangerous instrumentality doctrine and motor vehicle statutes is misplaced.   Not very compelling.

But even if we sidestep that shortfall, Defendants make a separate analytical misstep because they rely on the following sentence in *Baroletti* for the proposition

that questions of coverage are determined solely by reference to the language of an insurance policy above all else:

> In the absence of an overriding rule of law or public policy, the priority of coverage and the duty to defend the operator of a golf cart should be determined by the language of the relevant insurance policies.

*Baroletti*, 566 So. 2d at 315.   Defendants overstate the import of this sentence because the Second District never determined that courts must look *solely* to the language of an insurance policy.   Instead, the appellate court found that *priority* of coverage should be given to the relevant insurance policy unless there is an overriding rule of law or public policy.[4]   And that is what we have done here when looking first to the language of the policy and then giving additional meaning to the definition under Florida case law.   Defendants failed to grapple with any of this analysis or explain why *Baroletti* provides otherwise.

Apart from this, Defendants' argument relies on an incorrect statement of law because Florida courts have repeatedly found that insurance contracts should be interpreted to include the relevant provisions of insurance statutes.   *See Grant*, 638 So. 2d at 938 (holding that "where a contract of insurance is entered into on a matter surrounded by statutory limitations and requirements, the parties are presumed to have entered into such agreement with reference to the statute, and the statutory

---

[4]      Although Defendants overlook the difference between "solely" relying on an insurance policy versus giving "priority" to one, that is a significant distinction to grasp.   And it shows that language and context matter when relying on the text of an opinion.   If lawyers fail to understand these differences, then legal analysis becomes short-circuited with an oversimplification that fails to appreciate how a court arrives at a specific holding.   Defendants have made the same mistake here.

provisions become a part of the contract.") (quoting *Standard Marine Ins. Co. v. Allyn*, 333 So. 2d 497, 499 (Fla. 1st DCA 1976)); *see also State Farm Mut. Auto. Ins. Co. v. Laforet*, 658 So. 2d 55, 65 (Fla. 1995) (Wells, J., concurring) ("It is well-settled in this State that insurance contracts are to be construed so as to include the provisions of insurance contracts.") (citing cases); *Southeast Title & Ins. Co. v. Austin*, 202 So. 2d 179, 180 (Fla. 1967) ("The legislative prescription of a minimum 'coverage' obviously contemplates an Effective coverage for losses up to the specified amount, the express statutory intent being to provide that protection to exactly the same extent that a policyholder is 'legally entitled to recover damages' from a third party uninsured owner, no more, no less.")).   Any contention that statutes cannot be considered when interpreting Florida insurance contracts is simply incorrect. Therefore, no genuine issue of fact exists to preclude summary judgment in favor of Geico.

## E.   *Defendants' Counterclaim for Breach of Contract*

The final issue is Defendants' counterclaim for breach of contract. Defendants seek summary judgment on the allegation that Geico breached the insurance contract "by refusing to settle the Bennars claim against Ms. Acuna and by further refusing to indemnify her against the Final judgment."   [D.E. 16 at ¶ 17]. Geico disagrees because there is nothing in the insurance policy that requires it to settle any claims against an insured.   Geico says that the counterclaim identifies nothing in the policy that imposes this requirement and that it is entirely unclear how the alleged acts, even if true, constitute a breach.

Geico suspects that the counterclaim is premised on the duty of good faith that Florida law places on insurers. *See Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 672 (Fla. 2004) ("It has long been the law of this State that an insurer owes a duty of good faith to its insured.") (citing *Boston Old Colony Ins. Co. v. Gutierrez*, 386 So. 2d 783, 785 (Fla. 1980) ("The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so.")). If accurate, Geico says that these allegations amount to a bad faith claim that cannot be litigated until all coverage and liability issues have been resolved. *See Gen. Star Indem. Co. v. Anheuser-Busch Companies, Inc.*, 741 So. 2d 1259, 1261 (Fla. 5th DCA 1999) ("For both first party and third party bad faith claims against insurers, recent case law has clarified the point that coverage and liability issues must be determined before a bad faith cause can be prosecuted."). And since this case is presently resolving questions of coverage and a duty to defend or indemnify, Geico concludes that the bad faith claim is, at best, premature.

Defendants' response never confronts the question of whether the counterclaim is for breach of contract or bad faith. Defendants only trace the background of this case, where the Bennars reported an insurance claim to Geico following the accident. Defendants then mention how Geico learned the name of Minor Acuna, her parents, and all other relevant contact information to investigate the accident. Defendants also add that none of Geico's employees handling the body injury claim reviewed the investigation file and that it was not until March 2017 that

Geico recognized that it needed to tender policy limits for the covered loss. Defendants say that, it was at this point, Geico hired a law firm to arrange a global settlement conference, admitted that coverage existed for the golf cart accident, and detailed those findings in two written letters submitted in May 2017.  So, since Geico failed to settle the claim and reversed its prior coverage decision, Defendants reason that Geico's "position in this litigation is in contravention to its contractual obligations to Acuna."   [D.E. 60 at 12].

There are several problems with Defendants' response.  It is first unclear if the counterclaim is for a breach of contract[5] or bad faith because Defendants never clarify the confusion in their response.  Instead, Defendants add to the confusion with a reference to the Eleventh Circuit's decision in *Aldana v. Progressive Am. Ins. Co.*, 828 F. App'x 663, 668 (11th Cir. 2020).   The reliance on *Aldana* is perplexing is because – while Defendants refer to a breach of the duty to defend and indemnify in the heading of their response – that case is premised on bad faith, not breach of contract.  *Id.* at 666 ("The Aldanas then sued Progressive in Florida state court for bad faith failure to settle, seeking to collect the excess judgment as damages."); *id.* at 673 ("[W]e conclude that the evidence, when viewed in the light most favorable to the Aldanas, is sufficient to support a jury verdict in their favor in this bad-faith case.").

The confusion does not stop there, however, because – despite a recitation of the facts – Defendants fail to rely on any other legal authority or contractual basis for

---

[5]     The elements of a breach of contract claim under Florida law are: (1) a valid contract; (2) a material breach; and (3) damages.  *People's Trust Ins. Co. v. Valentin*, 305 So. 3d 324, 325 (Fla. 3rd DCA 2020) (citation omitted).

41

the relief they seek.   All Defendants say is "Geico's position in this litigation is in contravention to its contractual obligations to Acuna."   [D.E. 60 at 8].   That remark is unhelpful because it remains unclear what contractual obligation Geico breached in the first place and Defendants fail to point to anything in their response.   There is no mention, for example, of any contractual terms nor any legal authority that clarifies what this claim is or how it is viable.   The Court is left with nothing but a small set of facts, a case referencing a bad faith claim, and no policy provision or explanation as to how a breach of contract took place.

In any event, the breach of contract claim (to the extent it can be interpreted as such) fails for an entirely separate reason because, for the reasons set forth above, Geico properly denied coverage for the motor vehicle accident.   It is thus unclear how Geico could have breached a duty to defend and indemnify when it never had that duty in the first place.   *See Mt. Hawley Ins. Co. v. Miami River Port Terminal, LLC*, 228 F. Supp. 3d 1313, 1326–27 (S.D. Fla. 2017), *aff'd,* 713 F. App'x 951 (11th Cir. 2017) ("[B]ecause the Court has found that no duty to defend existed, there can be no breach of contract arising from Mt. Hawley's failure to defend.   Mt. Hawley's motion for summary judgment as to this Count is therefore granted."); *see also Am. Safety Indem. Co. v. T.H. Taylor, Inc.*, 513 F. App'x 807, 810 (11th Cir. 2013) ("[A] counterclaim by Taylor against American Safety for breach of contract and for bad faith refusal to investigate was correctly rejected by the district court after it concluded that American Safety had no duty to defend the arbitration claim.   There was no breach of contract and, therefore, no bad faith in refusing to perform it.").

42

That means the analysis provided earlier as to whether coverage ever existed for the golf cart also resolves the question as to whether Geico could have breached its obligations under the insurance policy. Accordingly, Geico's motion for summary judgment should also be **GRANTED** on Defendants' counterclaim, and Defendants' entire motion for summary judgment should be **DENIED**.[6]

### IV. CONCLUSION

For the foregoing reasons, it is hereby **RECOMMENDED** that:

A.     Geico's motion for summary judgment be **GRANTED** in all respects.

---

[6]     The one argument left unaddressed is the assertion that Geico cannot disregard a prior acknowledgement that it determined that coverage existed for the golf cart accident. Defendants suggests that a preliminary coverage determination is binding because Geico cannot make an earlier finding and then reach a different conclusion later. As support, Defendants reference a May 2017 coverage determination letter that Geico produced to the law firm of Cole Scott & Kissane:

> There is Bodily Injury coverage with $10,000 per person and $20,000 per occurrence. We have agreed to afford liability coverage in this matter since the word "auto" is not defined anywhere in our policy. Also we considered *Fireman's Fund Ins. Cos. v. Pearl*, 540 So. 2d 883 (Fla. 4th DCA 1989) and *Baldassini v. State Farm*, 545 F. App'x 842 (11th Cir. 2013) in our decision making.

[D.E. 51-7]. The reason this argument deserves little consideration is because "[Defendants are] not arguing coverage by estoppel," and there is no principle of law identified in any of the briefs that explains why Geico's preliminary determination is binding other than the assertion that Geico should not be allowed to backtrack. [D.E. 66 at 5]. That is, while Defendants complain that Geico previously found that coverage existed, they failed to identify anything that requires Geico to hold true to that position. And we have not located any principle of law that imposes coverage simply because an insurer "knows that there is coverage" and drafted a letter to that effect. [D.E. 53 at 12]. This argument can therefore be dismissed without much discussion because, similar to the counterclaim for breach of contract, there is a failure to present any legal authority or reasoning in support of this position.

B.      Defendants' motion for summary judgment be **DENIED**.

Pursuant to Local Magistrate Rule 4(b) and Fed. R. Civ. P. 73, the parties have fourteen (14) days from service of this Report and Recommendation within which to file written objections, if any, with the District Judge.   Failure to timely file objections shall bar the parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report *and* shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report.   28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *see, e.g., Patton v. Rowell,* 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Commissioner of Social Security,* 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**DONE AND SUBMITTED** in Chambers at Miami, Florida this 10th day of May, 2021.


/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge