**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 20-21549-CV-WILLIAMS/TORRES

EILEEN GONZALEZ, *et al.*,

       Plaintiffs,

v.

GEICO GENERAL INSURANCE COMPANY,

       Defendant.

_____/


**REPORT AND RECOMMENDATION**
**ON GEICO'S MOTION FOR SUMMARY JUDGMENT**


       Pending before the Court is GEICO's motion for summary judgment regarding the only remaining cause of action in this case—Plaintiffs' claim for "bad faith" under Florida law.  [D.E. 142].  The motion is fully briefed and therefore ripe for disposition.  [D.E. 153, 162].  And so, for the following reasons, the Court recommends that GEICO's motion for summary judgment be **GRANTED** and the case be **CLOSED**.[1]

---

[1]     On January 18, 2024, the Honorable Kathleen M. Williams referred GEICO's motion for summary judgment to the undersigned for a report and recommendation. [D.E. 144].

## I.   BACKGROUND

This case and its complicated procedural history stem from an accident involving a golf cart in which children were injured.   At this late phase of the case, the only remaining cause of action is an insurance bad faith claim alleged against GEICO by Eileen Gonzalez and Frank Bennar.[2]

The material facts are largely undisputed.[3]  On July 4, 2016, a car struck a golf cart driven by Zabryna Acuna and carrying Devin Bennar, Savannah Bennar, Isabella Bennar, and Luka Chiong.[4]  At the time of the accident, Zabryna's parents held an insurance policy with GEICO that provided bodily injury coverage in the amount of $10,000.00 per person and $20,000.00 per occurrence (the "Acuna Policy").[5]

---

[2]    The original parties included Luis Chiong (the owner of the golf cart), Zabryna Acuna (the driver of the golf cart during the accident), and Zabryna's parents Monika Acuna and Jesse Acuna (insured by the GEICO policy at issue).  Pursuant to the only remaining claim, the only Plaintiffs are Zabryna and Devin Bennar's parents—Eileen Gonzalez and Frank Bennar—who acquired their right to sue GEICO for bad faith through the consent of its insured, Zabryna.

[3]    Plaintiffs repeatedly violate S.D. Fla. L. R. 56.1(b) in their response to GEICO's statement of undisputed facts.  To dispute a statement material fact, a party must aver that a particular statement is "disputed" and then support its dispute with evidentiary citations.  S.D. Fla. L. R. 56.1(b)(2).  Accordingly, Plaintiffs' repeated assertions that particular statements are "[d]isputed as phrased" or "[d]isputed" simply because Plaintiffs are "without knowledge" regarding the stated fact or "[d]isputed" only insofar as the Plaintiffs disagree that a particular fact is "material" do not effectively controvert the facts submitted by GEICO.  *See, e.g.,* [D.E. 152 at ¶¶ 6, 8].   Therefore, unless otherwise noted, the Court will deem the uncontroverted material facts as undisputed by Plaintiffs pursuant to the discretion granted by S.D. Fla. L. R. 56.1(c).

[4]    [D.E. 141 at ¶¶ 1, 2]; [D.E. 152 at ¶¶ 1, 2].

[5]    [D.E. 141 at ¶ 3]; [D.E. 152 at ¶ 3].

Approximately eight months later, GEICO received a letter from Carlos Silva, the Bennars' lawyer, advising of his representation of Eileen Gonzalez, Frank Bennar, and the Bennar children in connection with the golf cart accident.[6]  This was the *first* time that GEICO received notice of a bodily injury claim against the Acuna Policy.[7]  GEICO separately received notice of the Bennar children's injuries in July 2016 through a claim made by the Bennars against a separate GEICO policy that they held at the time of the accident (i.e., the "Bennar Policy"); however, the record is silent regarding when, if ever, GEICO connected the dots between the Acuna Policy and the Bennar Policy prior to receiving the March 2017 letter from Attorney Silva.[8]

Attorney Silva further informed GEICO in March 2017 that Devin Bennar sustained a traumatic brain injury during the accident.[9]  In response to Attorney Silva's communications, GEICO assigned the claim to claims examiner Sheri Delaney who in turn "immediately" proceeded to investigate the loss in a variety of ways.[10]

---

[6]  [D.E. 141 at ¶ 4]; [D.E. 152 at ¶ 4].

[7]  [D.E. 141 at ¶ 4]; [D.E. 152 at ¶ 4].  Plaintiffs do not cite evidence to controvert that GEICO first received notice of a bodily injury claim *against the Acuna Policy* through a letter dated March 3, 2017.  Plaintiffs submit instead that GEICO has been aware of the loss since July 2016 because the Bennars, who held a separate policy with GEICO (the "Bennar Policy"), made a PIP claim on the Bennar Policy soon after the accident.  *See* [D.E. 50-17 at 58-60].

[8]  *See* [D.E. 50-17 at 58-66] (deposition of GEICO's corporate representative discussing GEICO's handling of the Bennar Policy claim); *see also* [D.E. 51-3 at 4] (September 2016 letter denying the Bennar Policy claim because GEICO determined that the golf cart was not a "motor vehicle" as defined in the Bennar Policy).

[9]  [D.E. 141 at ¶ 5]; [D.E. 152 at ¶ 5].

[10]  [D.E. 141 at ¶ 6]; [D.E. 152 at ¶ 6].

As part of this investigation, Ms. Delaney and other GEICO personnel sought to resolve questions such as the condition of the golf cart, who owned it, who was driving it at the time of the accident, how the accident occurred, how the passengers sustained their injuries, and whether the golf cart should be covered by the Acuna Policy.[11]  GEICO also periodically communicated with the interested parties about its ongoing investigation and the reservation of its rights under the Acuna Policy.[12]

On May 10, 2017, GEICO held a "roundtable meeting" regarding whether the golf cart was covered by the Acuna Policy; it determined at this meeting that the golf cart was *not* covered.[13]  Nevertheless, after consulting with in-house counsel, GEICO decided the following day to afford liability coverage under the Acuna Policy in conjunction with the golf cart accident.[14]

On May 12, 2017, GEICO asked outside counsel to set up a "global settlement conference" to settle all claims arising from the golf cart accident for the $20,000.00 policy limits available under the Acuna Policy.[15]  Ten days later, GEICO's counsel sent a letter to all interested parties advising that GEICO made $20,000.00 available to settle all claims and requesting that all potential claimants attend a conference on

---

[11]     [D.E. 141 at ¶¶ 6-34]; [D.E. 152 at ¶¶ 6-34].

[12]     *See id.*

[13]     [D.E. 141 at ¶ 35]; [D.E. 152 at ¶ 35].

[14]     [D.E. 141 at ¶ 36]; [D.E. 152 at ¶ 36].

[15]     [D.E. 141 at ¶ 38]; [D.E. 152 at ¶ 38].

June 13, 2017, for the purpose of facilitating a settlement; the letter specifically advised that GEICO's tender of the policy limits would "never be withdrawn."[16]  On May 30, 2017, GEICO sent additional correspondence to the interested parties, including Attorney Silva, explaining GEICO's decision to afford coverage under the Acuna Policy.[17]

One day before the global settlement conference, Attorney Silva advised GEICO's counsel that neither he nor his clients would attend the conference because GEICO had purportedly acted in bad faith.[18]  Despite Attorney Silva's absence, GEICO did not revoke its $20,000.00 global settlement offer; by contrast, in the days following the settlement conference, GEICO delivered a $20,000.00 check to Attorney Silva's office and communicated to him that the Acuna's policy limits were being given to the Bennars to resolve their bodily injury claims arising from the accident.[19]

On June 20, 2017, Attorney Silva returned GEICO's $20,000.00 check, reiterating his "bad faith" allegation and advising that the tender was otherwise "defective" and "untimely."[20]  But the following week, an associate of Attorney Silva

---

16      [D.E. 141 at ¶ 39]; [D.E. 152 at ¶ 39].

17      [D.E. 141 at ¶ 40]; [D.E. 152 at ¶ 40].

18      [D.E. 141 at ¶ 41]; [D.E. 152 at ¶ 41].

19      [D.E. 141 at ¶¶ 42-46]; [D.E. 152 at ¶¶ 42-46].

20      [D.E. 141 at ¶ 47]; [D.E. 152 at ¶ 47].

communicated to GEICO that they nevertheless wanted to settle the claims of Savannah and Isabella.[21]

GEICO learned soon thereafter that the Bennars filed suit against the Acunas in connection with the golf cart accident.[22]  GEICO appointed counsel to defend the Acunas in that lawsuit.[23]

On August 8, 2017, Attorney Silva's office and GEICO reached an agreement to settle Savannah and Isabella's claims for $5,000.00 each.[24]  Accordingly, on August 17, 2017, GEICO reissued the remaining $10,000.00 bodily injury limits to Attorney Silva to settle Devin's claim.[25]  Attorney Silva again refused to settle Devin's claim for the tendered policy limits.[26]  GEICO responded that it was nevertheless "ready, willing and able to reissue" the $10,000.00 check to settle Devin's claim.[27]  GEICO never settled Devin's claim prior to or during this case; however, on July 14, 2020, the Bennars obtained a final judgment against Zabryna, the driver of the golf cart, for $18,000,000.00.[28]

---

[21]     [D.E. 141 at ¶ 48]; [D.E. 152 at ¶ 48].

[22]     [D.E. 141 at ¶ 49]; [D.E. 152 at ¶ 49].

[23]     [D.E. 141 at ¶ 50]; [D.E. 152 at ¶ 50].

[24]     [D.E. 141 at ¶¶ 51-52, 56]; [D.E. 152 at ¶¶ 51-52, 56].

[25]     [D.E. 141 at ¶ 53]; [D.E. 152 at ¶ 53].

[26]     [D.E. 141 at ¶ 54]; [D.E. 152 at ¶ 54].

[27]     [D.E. 141 at ¶ 55]; [D.E. 152 at ¶ 55].

[28]     *See* [D.E. 141 at ¶¶ 57-58]; [D.E. 152 at ¶¶ 57-58].

GEICO submits in its motion for summary judgment that, based upon the undisputed material facts, no reasonable jury could find it liable for bad faith in connection with its handling of Devin Bennar's bodily injury claim against the Acuna Policy. In accordance with Florida law, we are inclined to agree that there is no genuine dispute as to any material fact in this case and that GEICO is accordingly entitled to judgment as a matter of law on the bad faith claim.

## II.    ANALYSIS

GEICO submits that a reasonable jury could not find bad faith from the record before us because GEICO did not have a reasonable opportunity to settle Devin's claim for the policy limits. After discussing the legal standard that applies to summary judgment motions and the Florida law that governs bad faith claims, we conclude that GEICO cannot be found to have acted in bad faith as a matter of law.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(c)(1). "On summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the

motion." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 597 (1986).

In opposing a motion for summary judgment, the nonmoving party may not rely solely on the pleadings, but must show by affidavits, depositions, answers to interrogatories, and admissions that specific facts exist demonstrating a genuine issue for trial. *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The existence of a mere "scintilla" of evidence in support of the nonmovant's position is insufficient; there must be evidence on which the jury could reasonably find for the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "A court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, or upon which the non-movant relies, are 'implausible.'" *Mize v. Jefferson City Bd. Of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996) (citing *Matsushita*, 475 U.S. at 592-94).

At the summary judgment stage, the Court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In making this determination, the Court must decide which issues are material. A material fact is one that might affect the outcome of the case. *See id.* at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."). "Summary judgment will not lie if the dispute about a material fact is

'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ibid.*

Florida's insurance bad faith law "imposes a fiduciary obligation on an insurer to protect its insured from a judgment that exceeds the limits of the insured's policy." *Harvey v. GEICO Gen. Ins. Co.*, 259 So. 3d 1, 3 (Fla. 2018). "Bad faith law was designed to protect insureds who have paid their premiums and who have fulfilled their contractual obligations by cooperating fully with the insurer in the resolution of claims." *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 682 (Fla. 2004). The Florida Supreme Court has explained that:

> The insurance contract requires that the insured surrender to the insurance company control over whether the claim is settled. In exchange for this relinquishment of control over settlement and the conduct of the litigation, the insurer obligates itself to act in good faith in the investigation, handling, and settling of claims brought against the insured. Indeed, this is what the insured expects when paying premiums.

*Id.* at 682-83.  Thus, bad faith jurisprudence merely "holds insurers accountable" for failing to fulfill their obligations. *Harvey*, 259 So. 3d at 6 (quoting *Berges*, 896 So. 2d at 683).

In handling the defense of claims against its insured, the insurer "has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." *Id.* (quoting *Boston Old Colony Ins. Co. v. Gutierrez*, 386 So. 2d 783, 785 (Fla. 1980)). In *Boston Old Colony*, the Florida Supreme Court explained at length what this duty entails:

> This good faith duty obligates the insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the

9

> litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same. The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so. Because the duty of good faith involves diligence and care in the investigation and evaluation of the claim against the insured, negligence is relevant to the question of good faith. The question of failure to act in good faith with due regard for the interests of the insured is for the jury.

386 So. 2d at 785 (internal citations omitted); *see also Harvey*, 259 So. 2d at 9 (noting that "negligence alone is insufficient to prove bad faith"). The conduct in question must evidence a "*conscious disregard or indifference* to the rights of the insured." *Feijoo v. GEICO Gen. Ins. Co.*, 137 F. Supp. 3d 1320, 1330 (S.D. Fla. 2015) (emphasis added); *Francois v. Illinois Nat. Ins. Co.*, No. 01-cv-08070, 2002 WL 33760405, at *4 (S.D. Fla. Mar. 28, 2002) (citing *Auto Mutual Indemnity Co. v. Shaw*, 134 Fla. 815, 830-32 (Fla. 1938)).

"The question of whether an insurer acted in bad faith . . . is determined under the totality of the circumstances." *Moore v. GEICO Gen. Ins. Co.*, 758 F. App'x 726, 729 (11th Cir. 2018) (internal citation and quotation omitted). The "critical inquiry in a bad faith [case] is whether the insurer diligently, and with the same haste and precision as if it were in the insured's shoes, worked on the insured's behalf to avoid an excess judgment." *Harvey*, 259 So. 3d at 7. In other words, "the focus in a bad faith case is not on the actions of the claimant but rather on those of the insurer in fulfilling its obligations to the insured." *Berges*, 896 So. 2d at 677. "The damages claimed by an insured in a bad faith case 'must be caused by the insurer's bad faith.'" *Id.* (quoting *Perera v. U.S. Fidelity & Guar. Co.*, 35 So. 3d 893, 902 (Fla. 2010)).

Where the insurer had no reasonable opportunity to settle the claim, however, the insurer "could not have acted in bad faith as a matter of law." *Deary v. Progressive Am. Ins. Co.*, 536 F. Supp. 3d 1298, 1266 (S.D. Fla. 2021) (citing *RLI Ins. Co. v. Scottsdale Ins. Co.*, 691 So. 2d 1095, 1096 (Fla. 4th DCA 1997), *aff'd.*, No. 21-11878, 2022 WL 2916358, at *3-4 (11th Cir. July 25, 2022).  Thus, although it is usually for the jury to decide whether an insurer has acted in bad faith, it is well-established that an insurer may be entitled to summary judgment if the insurer did not have a reasonable opportunity to settle the claim at issue.  *See, e.g., Mesa v. Clarendon Nat. Ins. Co.*, 799 F.3d 1353, 1358-60 (11th Cir. 2015); *Montanez v. Liberty Mut. Fire Ins. Co.*, 824 F. App'x 905, 910-12 (11th Cir. 2020); *Deary*, 536 F. Supp. 3d at 1269-70; *Valle v. State Farm Mut. Auto. Ins. Co.*, No. 08-cv-22117, 2010 WL 5475608, at *2-4 (S.D. Fla. Jan. 15, 2010), *aff'd.*, 394 F. App'x 555, 557-58 (11th Cir. 2010).  GEICO asserts that this such a case.

To illustrate why GEICO's argument is well taken, compare the facts here with those in *Mesa*, where four people were injured in a car accident caused by an insured driver. 799 F.3d at 1355-56.  Three weeks after the accident, the insurer received notice of the accident through a letter from one of the injured parties.  *Id.* at 1356. The insurer promptly hired an adjuster to investigate the claim as well as an attorney to identify potential claimants and to assist those claimants in reaching a global settlement.  *Id.*  A little more than a month after the accident, the insurer's attorney communicated to the claimants that the insurer was willing to tender the full $20,000.00 bodily injury limits in furtherance of the global settlement even though it

understood that such a sum would be insufficient to satisfy all of the claimants' damages. *Id*. One month later, the insurer's attorney followed up on his settlement correspondence and again tried to coordinate a global settlement conference. *Id*. In response to the follow-up settlement communications, three of the claimants expressed a willingness to settle their claims by dividing the policy limits equally among the four claimants. *Id*. The fourth claimant, Carlos Mesa, did not respond to the settlement letters sent by the insurer's attorney. *Id*. at 1356-57. And even though he never voiced an objection to settling the claims globally, Mesa quietly filed a lawsuit against the insured while the other parties attempted to coordinate a collective settlement. *Id*.

Approximately four months after the accident, the insurer and the insured learned of Mesa's lawsuit and were told (for the first time) that Mesa would be unwilling to accept less than half of the $20,000.00 policy limits. *Id*. After obtaining an excess judgment against the insured, Mesa filed a bad faith action against the insurer premised on the insurer's failure to immediately tender the $10,000.00 per person liability limits to Mesa. *Id*. at 1358-60. The district court granted summary judgment on the bad faith claim in the insurer's favor and the Eleventh Circuit affirmed, holding that no reasonable jury could find that the insurer acted in bad faith because the insurer's decision to "pursue a global settlement was consistent with its duty of good faith under Florida law" and "it is not unusual for settlement negotiations to last several months." *Id*. at 1360.

Along the same lines, the Eleventh Circuit in *Montanez* addressed a bad faith claim where an insured's son caused an accident with two other vehicles that resulted in the death of one person and injuries to four others. 824 F. App'x at 907.  Upon being notified of the accident, the insurer began to investigate coverage and to gather information regarding the claimants' injuries.  *Id*.  More than a month after being notified of the accident, the insurer sent a letter to all claimants that offered the insurer's per accident policy limits and advised that it would arrange a settlement conference to apportion the insurance proceeds.  *Id*. at 908.  Counsel for the decedent's estate subsequently wrote to the insurer and preemptively rejected any offer by the insurer to settle the wrongful death claim.  *Id*.  The estate's attorney argued that the insurer acted in bad faith by trying to schedule a settlement conference and not immediately tendering the per person policy limits to settle the wrongful death claim, even though the decedent's attorney never demanded to settle that claim.  *Id*.

In the subsequent bad faith action, the district court entered summary judgment in favor of the insurer, holding that no reasonable jury could find that the insurer failed to act with appropriate care and diligence; moreover, the district court concluded, no reasonable jury could find that the month-long delay between learning of the accident and scheduling a global settlement conference was unreasonable.  *Id*. at 909.  The Eleventh Circuit affirmed and held that there was "no evidence" indicating the insurer unreasonably exposed its insured to a judgment in excess of his policy limits.  *Id*. at 912.  As the Court put it:

> Despite the fact that Plaintiff never even attempted to communicate
> with Defendant—much less make a settlement demand—before

Defendant made the full policy limits available, Plaintiff contends that Defendant should have immediately tendered the $250,000 policy limit for the wrongful death claim. But "because there were multiple claimants, Defendant's decision to pursue a global settlement was consistent with its duty of good faith under Florida law." Moreover, given the lack of communication from Plaintiff, we see no evidence in the record suggesting that Defendant knew it was exposing its insured to excess liability by failing to immediately tender the full policy limits for the wrongful death claim and by proposing a global settlement conference 32 days after first learning of the accident and before receiving any of the medical records that it repeatedly sought during that period.

*Id.* at 911-12 (internal citations omitted and alterations adopted).

In *Deary*, a similar finding was rendered as a matter of law: An insurer was never presented with a reasonable opportunity to settle because the injured party withdrew her settlement demand at the same time that she increased her damages amount by electing to undergo surgery. 536 F. Supp. 3d at 1269. After a car accident where the insured was at fault, the insurer and one of the injured claimants began to negotiate a settlement. *Id.* at 1260-62. The insurer believed that the claim could be fairly settled for $12,701.00 or less, but the claimant demanded that she be paid the full $25,000.00 bodily injury policy limits. *Id.* at 1262-63. The claimant subsequently elected to undergo spinal surgery to resolve pain allegedly caused by the accident and, only a few days before the surgery, she notified the insurer that her $25,000.00 demand was withdrawn because she would be undergoing surgery. *Id.* Because its previous damages calculation had not accounted for spinal surgery, the insurer responded by increasing its settlement offer to the $25,000.00 limit; however, the claimant countered with a $250,000.00 settlement demand. *Id.* at 1263. In the subsequent bad faith action, the district court awarded summary judgment to the

14

insurer and the Eleventh Circuit affirmed.  *Id*. at 1269-70.   Highlighting that the claimant's $25,000.00 settlement demand was arguably too high until she elected to undergo surgery, the district court noted that the insurer was never given a reasonable opportunity to settle the claim for $25,000.00 because "in the same breath that Plaintiff advised Progressive that she intended to undergo the spinal surgery, which would obviously increase her damages, she closed the door to settlement at or within the policy limits." *Id*. at 1269.  And absent a reasonable opportunity to settle the claim, no reasonable jury could find that the insurer acted in bad faith.  *Id*. at 1269-71.

*Valle* is also instructive.  There the insured caused a motor vehicle accident which resulted in the death of one person and injuries to seven others.  *Valle*, 395 F. App'x at 556.  Shortly after it learned of the accident, the insurer contacted the potentially aggrieved parties in an effort to resolve its liability.  *Id*.  About one month after the accident, and after receiving responses from all but the decedent's estate, the insurer indicated to all parties that it was willing to settle for the policy limits so long as the parties could agree on a collective settlement.  *Id*.   The settlement conference occurred a little more than two months later, at which time the estate learned that the other seven parties were willing to give the estate $10,000.00 and then split the remaining $10,000.00 of the policy limits among themselves.  *Id*.  The estate rejected the settlement offer and instead pursued a bad faith claim against the insurer relating to the delay in payment.  *Id*.  The district court granted summary judgment and the Eleventh Circuit affirmed, noting that it could not find any Florida

case law "permitting a third-party claimant to participate in settlement negotiations, reject a policy-limits settlement offer, claim post-hoc that the offer was untimely, and prevail in a bad faith action against the insurer." *Id*. at 557.

Plaintiffs are hoping that this case bucks the trend discussed above. Here, it is important to recall that the Bennars are not suing GEICO for its conduct in processing the PIP claim that Devin's parents made on *their policy* shortly after the golf cart accident. The bad faith claim at issue is limited to GEICO's conduct in processing the bodily injury claim made against the *Acuna Policy*, which GEICO undisputedly learned about in March 2017. Nevertheless, Plaintiffs argue that GEICO learned of Devin's injuries only weeks after the accident and therefore GEICO's coverage investigation effectively lasted almost one year. This ten-month duration factors heavily into Plaintiffs' bad faith argument because, in their view, it evidences GEICO's selfish and unnecessarily prolonged focus on avoiding its liability under the Acuna Policy.

The problem Plaintiffs have, however, is that there is no evidence other than speculation to support this argument. The undisputed record clearly shows that GEICO learned about Devin's injuries in July 2016 because his parents filed a PIP claim on their GEICO policy. GEICO denied that PIP claim, but nothing in the record other than Plaintiffs' speculation shows that, in adjudicating the PIP claim, GEICO's assigned adjuster realized that the Acuna Policy might provide coverage for Devin's loss. By contrast, the record shows that the adjuster assigned to the Bennar Policy PIP claim answered only the question presented (i.e., whether the Bennar Policy

covered the claimed loss) without considering whether any other policies may be liable for the damage. Accordingly, the undisputed record reflects that GEICO first learned about the bodily injury claim being made against the Acuna Policy on March 3, 2017—the date that Attorney Silva, the Bennars' lawyer, contacted GEICO about the claim. Although the denial of the PIP claim on the Bennar Policy factors into the totality of the circumstances analysis, the duration of the coverage investigation undertaken by GEICO *in connection with the bodily injury claim made on the Acuna Policy* was only 69 days—March 3 (the date GEICO learned of the claim) to May 11 (the date GEICO decided to afford liability coverage for the claim)—not ten months as Plaintiffs suggest.

We therefore find it dubious at best for Plaintiffs to claim now, as they did back in 2017, that GEICO's settlement offer was untimely and that this alleged untimeliness is evidence of bad faith. The case law is clear that both coverage investigations and settlement negotiations in this area can take several months to complete. Moreover, this tragic accident is not a run-of-the-mill fender bender. GEICO was confronted with an accident between a car and a golf cart that was being driven by unlicensed teenager who did not (and whose parents did not) own the golf cart involved in the accident. Five passengers were hurt, including Devin whose life has been permanently changed by the injuries he sustained in this accident. And as GEICO attempted to ascertain important details regarding the accident, its investigation was delayed by forces beyond its control such as the golf cart's presence in a police impound lot and the police's refusal to allow GEICO to inspect the golf cart

absent the presence of a specific detective. In sum, resolution of the bodily injury claim on the Acuna Policy was necessarily going to take some time in light of the complicated facts involved.

It is further undisputed that the Bennars never made a settlement demand for the $10,000.00 policy limits. And aside from the self-serving affidavits of Eileen Gonzalez and Attorney Silva, there is no evidence to suggest that the Bennars *ever* considered settling Devin's claim against the Acuna policy for that amount. Indeed, even when viewed in the light most favorable to the Bennars, the balance of the record suggests that $10,000.00 was far below what they would have been willing to accept.

After GEICO concluded its two-month coverage investigation and made the full bodily injury policy limits available, it properly sought to coordinate a global settlement conference to resolve all liability claims. Nevertheless, Attorney Silva advised GEICO the day before the conference that neither he nor his clients would attend. And when GEICO tendered a check for $20,000.00 to Attorney Silva to settle the claims of the Bennar children, he returned the check to GEICO and claimed that the settlement offer was "untimely." Notably, however, this alleged untimeliness did not preclude the Bennars from subsequently settling their daughters' claims against the Acuna Policy.

Considering the record as a whole, the undisputed facts show that GEICO was never given a reasonable opportunity to settle with Devin for the $10,000.00 per person policy limit. The Bennars insist that they would have accepted a $10,000.00 settlement prior to the conclusion of GEICO's coverage investigation; however,

because the investigation did not conclude prior to an arbitrary and uncommunicated deadline, GEICO's settlement offer was somehow untimely in their view and thus they rejected the offer because they believed GEICO to be operating in bad faith.

Nevertheless, the undisputed record shows that GEICO diligently investigated the coverage issue that it identified soon after it learned of the claim. And it needed the time it took to conclude its coverage investigation because, to some extent, aspects of the investigation were beyond its control. GEICO kept the relevant parties informed about the progress of its investigation and, very soon after the investigation concluded, GEICO offered the policy limits and attempted to coordinate a global settlement with those who it perceived to be potential claimants. During the investigation, the Bennars never demanded the policy limits from GEICO. After the investigation concluded, the Bennars refused to attend a settlement conference where it knew the maximum recovery would be $20,000.00. And after the settlement conference, the Bennars refused to settle their children's claims because payment was untimely; however, that timeliness problem ultimately was not a problem as far as Devin's siblings were concerned.

All things considered, and even accepting as true that the Bennars would have accepted $10,000.00 for Devin's claim if GEICO tendered the money before the Bennars' unspoken deadline, the Bennars never gave GEICO a reasonable opportunity to settle Devin's claim because GEICO could not have known that its coverage investigation, which it had a right to conduct, needed to be resolved in only a few weeks if it was going to have a chance to settle for the policy limits.

Cases like *Mesa*, *Montanez*, *Deary*, and *Valle* teach that an insurer does not act in bad faith by instigating a two-month coverage investigation and then attempting to reach a global settlement with potential claimants for the maximum amount of money afforded by the insurance policy at issue.  These cases also teach that, when a claimant does not give an insurer a reasonable opportunity to settle a claim, the insurer cannot be found to have acted in bad faith as a matter of law.  Here, the undisputed facts demonstrate that GEICO did *not* have a reasonable opportunity to settle Devin's bodily injury claim on the Acuna Policy.   Accordingly, GEICO did not act in bad faith and summary judgment should be granted in GEICO's favor.

### III.   CONCLUSION

For the foregoing reasons, GEICO's motion for summary judgment should be **GRANTED** and the case should be **CLOSED**.

Pursuant to Local Magistrate Rule 4(b) and Fed. R. Civ. P. 73, the Court finds good cause to expedite objections and therefore the parties have seven (7) days from service of this Report and Recommendation within which to file written objections, if any, with the District Judge.  Failure to timely file objections shall bar the parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report *and* shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report.  28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *see, e.g., Patton v. Rowell,* 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Commissioner of Social Security,* 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 3rd day of

April, 2024.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge